**Edward Joseph X. CHAPMAN,
Plaintiff-Appellant,**

v.

**George PICKETT et al.,
Defendants-Appellees.**

No. 77–1859.

United States Court of Appeals,
Seventh Circuit.

Argued April 13, 1978.

Decided Oct. 30, 1978.

Rehearing and Rehearing In Banc
Denied Jan. 11, 1979.

Diane C. Geraghty, Chicago, Ill., for plaintiff-appellant.

David E. Worsley, Danville, Ill., for defendants-appellees.

Before CASTLE, Senior Circuit Judge, and SWYGERT and SPRECHER, Circuit Judges.

SWYGERT, Circuit Judge.

In this case involving the constitutional rights of a federal prisoner, plaintiff-appellant Edward Joseph X. Chapman appeals the denial by the district court after a bench trial of his prayers for injunctive, declaratory, compensatory, and punitive relief. Chapman contends that defendants violated his First Amendment rights by punishing him for his refusal on religious grounds to handle pork during a kitchen cleanup detail. Finding that defendants enjoy a qualified official immunity from liability for damages and ruling that the adoption of a new policy by the Bureau of Prisons and plaintiff's release on parole mooted his requests for injunctive and declaratory relief, the district court refused to reach the merits of Chapman's First Amendment claim. Although agreeing with Chapman that the punishment he suffered was so disproportionate to the severity of the offense with which he was charged that it violated his Eighth Amendment rights, the district court ruled that he was not entitled to monetary damages because he had failed to show that actual damages were suffered. We affirm the district court's finding of qualified immunity on the First Amendment issue but reverse on the question of mootness. As to

the Eighth Amendment claim, we affirm as to liability but reverse on the issue of damages.

## I

Edward Joseph X. Chapman was a prisoner in the federal penitentiary at Leavenworth, Kansas when, on October 4, 1972, he was transferred to the Marion, Illinois penitentiary. On October 9 Chapman was assigned to the kitchen detail, which assignment included transporting food carts and clearing food off of them. When Chapman discovered that the food trays in the carts contained pork, he went to his supervisor, defendant J. E. Brown, and informed him that because of the beliefs of his Black Muslim faith, he could not handle the pork on the trays. According to his testimony at trial, Brown then offered Chapman the use of either gloves or various kitchen utensils to enable him to complete the task. While Chapman at trial denied that he was offered these, he did acknowledge that, regardless of such an offer, he would still have refused to do the work, since even indirect touching was forbidden. Brown then advised Chapman that he would be forced to write a disciplinary report on Chapman if the task were not performed. Chapman responded by saying that the last man who had written a report on him concerning an incident of this nature had been "blown out of an oven" at Leavenworth just two months previously.

After the incident Brown filed a report charging Chapman with violating Prison Code § 303, "Failing to perform work as instructed by a supervisor." His report also mentioned the Leavenworth remark. An investigative report, completed the day of the incident by another official and sent to the prison's Adjustment Committee, stated that "Chapman had a very good attitude." It noted that "apparently through Chapman's efforts someone had removed the pork from the cart and Chapman had finished cleaning the cart."

On October 11 the Adjustment Committee, which included defendants Jack Culley, Earl Buzzard, and E. M. Cage, met to consider Brown's report. Chapman was present and, upon having the report read to him, admitted the facts of the incident, again explaining that his refusal was the result of his Black Muslim beliefs. The Committee decided to punish Chapman by placing him in the segregation unit for an indeterminate term.

Chapman's status in segregated confinement was reviewed periodically. At least once during this confinement Chapman sought a formal explanation of his confinement from defendant George Pickett, warden at Marion, and requested immediate release. No reply from Pickett was received. During Chapman's confinement on March 15, 1973, Pickett received a copy of a letter dated March 9, 1973 from the Director of the Federal Bureau of Prisons, Norman A. Carlson, in which the Director stated to Congressman Charles Rangel that "We have re-examined the situation and have communicated to the heads of our facilities instructions not to assign individuals to the details where they must work with pork if it is against the religious beliefs of those men." Chapman was not returned to the general prison population, however, until July 25, 1973. While in segregation, Chapman did not eat foods containing pork. He was not provided with added portions of items not containing pork.

Prior to his release from segregation, Chapman instituted this action. Following a one-day hearing held on October 9, 1973, the district court for the Eastern District of Illinois entered judgment for defendants, ruling that Chapman's request for an injunction was mooted by his release from segregation and that Chapman had failed to prove his complaint. On appeal to this court we affirmed the denial of a mandatory injunction but otherwise reversed and remanded the cause for a new trial, finding that the claims for monetary, declarative, and prohibitive injunctive relief had not been mooted. *Chapman v. Kleindienst*, 507 F.2d 1246 (7th Cir. 1974). We also found that the district court had prematurely terminated Chapman's presentation of evidence and had erred in concluding that

Chapman had failed to prove a prima facie case. Following the remand, a new trial was held. The district judge found Chapman's confinement in segregation was excessive after May 5, 1973 and declared that this violated Chapman's rights under the Eighth Amendment. All other relief prayed for by Chapman, however, was denied. Chapman then brought this appeal.

## II

Chapman first appeals the district court's ruling that the defendants enjoy qualified official immunity from liability for the damages he claims to have suffered as a result of their violation of his First Amendment rights. The test currently employed to determine the availability of the official immunity defense was enunciated by the Supreme Court in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Although that case involved the immunity of local school board members, the same test was applied by this court to state correctional administrators in *Knell v. Bensinger,* 522 F.2d 720 (7th Cir. 1975). The Supreme Court recently approved this extension of the *Wood* test to prison officials and officers in *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978).[1]

As the Court states in *Navarette,* the test is essentially two-pronged:

> Under the first part of the *Wood v. Strickland* rule, the immunity defense would be unavailing to petitioners if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right and if they knew or should have known that their conduct violated the constitutional norm.

> \* \* \* \* \* \*

> [T]he second branch of the *Wood v. Strickland* standard . . . would authorize liability where the official has acted with "malicious intention" to deprive the plaintiff of a constitutional right or to cause him "other injury." This part of the rule speaks of "intentional injury," contemplating that the actor intends the consequences of his conduct.

*Id.* at 562, 566, 98 S.Ct. at 861–62. Since Chapman does not contend that defendants acted with malicious intentions, and since the record is devoid of evidence that defendants did so act, we are here concerned solely with the first prong of the *Wood* test.

One of the requirements of this test is that the constitutional right allegedly infringed by the defendants must have been clearly established at the time of the challenged conduct. The general First Amendment right of a prisoner to be free from punishment or discrimination on account of his religious faith may be said to be clear. *Cooper v. Pate,* 382 F.2d 518, 521 (7th Cir. 1967). Under *Procunier v. Navarette, supra,* however, it appears that the right in question must have been established in a more particularized way to meet the *Wood* test.

In *Navarette* a state prisoner sought relief for an alleged violation of 42 U.S.C. § 1983 when prison officials interfered with his outgoing mail. The Supreme Court held that, at the time of the alleged interference, no specific right protecting the mailing privileges of prisoners had been established. The Court so held even though a series of cases in the local United States district court had confirmed such rights as that of inmates to receive newspapers and magazines and that of parolees to make speeches to public gatherings without obtaining ad-

---

1. It may be noted that *Wood, Knell,* and *Navarette* all were 42 U.S.C. § 1983 cases against state officials, whereas the instant case is an action against federal officials based directly on the Constitution in the manner of *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In *Butz v. Economou,* —— U.S. ——, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Supreme Court approved the use of the test as developed in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), in cases involving the question of qualified official immunity of federal executive officials in *Bivens*-type cases. The *Wood* test for the applicability of the qualified immunity specified in *Scheuer* is utilized here because it is the test used by the Court in analyzing the immunity of state prison officials in *Navarette.*

vance permission. 434 U.S. at 564 n. 11, 98 S.Ct. 855. Indeed, one case had recognized that pretrial detainees have a First Amendment right in their correspondence. *Id.* None of these cases, however, had dealt specifically with the rights of convicted prisoners in their mail, and thus the Court found that the particular constitutional right at issue had not yet been declared.

■ Following the rationale of *Navarette,* it would appear that the specific right at issue here—that of a prisoner to refuse an order requiring him to handle foodstuffs forbidden by his religion—was not "clearly established" in October 1972. While *Cooper* noted the existence of a prisoner's right to be free from punishment on account of his religious beliefs, it also noted that a prisoner is subject to various curtailments of his freedom to exercise his beliefs. 482 F.2d at 521. Indeed, courts in other circuits had at the time declared that the practice of one's religious faith does not permit violation of prison discipline. *Evans v. Ciccone,* 377 F.2d 4 (8th Cir. 1967); *Sostre v. McGinnis,* 334 F.2d 906, 908 (2d Cir.), *cert. denied,* 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 (1964). In *Evans* a federal prisoner of the Islamic faith had been disturbing others by religious discussion and was punished for direct disobedience of an order to return to bed. The court held that he had not suffered discrimination on account of his religion, noting that "[f]reedom of religion can never mean . . . freedom to flagrantly disregard reasonable rules of conduct in or out of prison." 377 F.2d at 6. We need not here comment on the correctness of these decisions or whether they would necessarily be followed today. It is sufficient that we note their existence at the time of the incident at issue, for, coupled with the absence of decisions which could be said to declare such a right, they support the proposition that no such right was "clearly established" at the time. "Because they could not reasonably have been expected to be aware of a constitutional right that had not yet been declared, [defendants] did not act with such disregard for the established law that their

conduct 'cannot reasonably be characterized as in good faith.'" *Procunier v. Navarette,* 434 U.S. at 565, 98 S.Ct. at 861 (citation omitted). Thus, the *Wood* test is not met and official immunity is available to the defendants as a defense to Chapman's First Amendment claim for monetary damages.

### III

■ That defendants are immune from monetary damages based on the First Amendment claim does not, of course, render moot Chapman's claims for injunctive and declaratory relief. Nor does the fact that Chapman is currently on parole moot these claims, as the district court apparently reasoned. In *Chapman v. Kleindienst,* we noted that "[a]s long as Chapman remains at Marion, and as long as he may again be required to handle pork, or may again go before the Adjustment Committee, the possibility of the reoccurrence of these issues satisfies the 'actual controversy' requirement of the Declaratory Judgments Act, 28 U.S.C. § 2201, and the 'case or controversy' requirement of Article III." 507 F.2d at 1249–50 (footnote omitted). While it is true that Chapman is no longer physically at Marion, he will apparently remain on parole until 1988 and could be returned to prison should he violate the terms of his conditional release. Because there may yet be a continuing effect from the use of records maintained concerning the punishment he received,[2] we may not dismiss the matter as moot. *Morales v. Schmidt,* 489 F.2d 1335 (7th Cir. 1973); *Black v. Warden,* 467 F.2d 202 (10th Cir. 1972).

The instant case is distinguishable from *Preiser v. Newkirk,* 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975). In *Preiser* the Court ruled that a prisoner's request for declaratory and injunctive relief following an unconstitutional transfer had been mooted by the fact that the prisoner had been transferred back to his original prison. The Court stated that the mere possibility the prison authorities might use the record notations of the transfer against the prisoner

---

2. *E. g.,* if Chapman should be returned to prison, computation of good time allowance may be affected by past punishment. *See* 18 U.S.C.

§ 4161; *Black v. Warden,* 467 F.2d 202 (10th Cir. 1972).

in the future was too speculative to merit review of the prisoner's requests that the transfer be declared unconstitutional and that an injunction issue ordering that all records of it be expunged and that no future transfer be made without a hearing. The Court relied on the fact that a notation had been made in his file by the prison authorities expressly stating that the transfer should have no bearing in any future determinations. It was thus able to say that it had before it more than a mere voluntary cessation of allegedly illegal conduct which left the defendant free to return to his old ways. *Id.* at 402, 95 S.Ct. 2330.

Unlike the Court in *Preiser,* we have before us no indication of any kind that the record of Chapman's punishment will not be used against him in the future. Thus, the issue of an injunction against such future use is not moot. On remand, which we order *infra,* the district court should address itself to the question of expurgation of the record of his punishment, which will entail an inquiry into whether Chapman was wrongfully placed in segregation in violation of his First Amendment rights. *See Chapman v. Kleindienst,* 507 F.2d at 1248 n. 2. *See also Ware v. Heyne,* 575 F.2d 593 (7th Cir. 1978).

With regard to Chapman's request for declaratory and injunctive relief against future infringements of his religious freedom, following the rationale of *Preiser,* that request has been mooted by the adoption of a new Bureau of Prisons policy prohibiting the assignment of prisoners to details where they must work with pork if it is against their religious beliefs. *See* Plaintiff's Exhibit No. 4. Therefore, no further action on these claims need be taken on remand.

### IV

■ Chapman also appeals the district court's denial of his claim for relief based on the fact that he was not provided food substitutes for the pork items from which he abstained during confinement in segregation. The district court based its denial of relief on the doctrine of *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). The Court in that case stated that 42 U.S.C. § 1983 "impose[s] liability—whether in the form of payment of redressive damages or being placed under an injunction—only for conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and the laws." *Id.* at 370–71, 96 S.Ct. at 604. It therefore refused to hold liable supervisory personnel who played no affirmative part in the deprivation of a right. The district court in the instant case found that the evidence showed that at best only one defendant, Pickett, had any responsibility for the diet of prisoners in segregation, and that Pickett's responsibility was merely supervisory. Since nothing has been shown to contradict these findings, we affirm the district court's application of the *Rizzo* doctrine.[3]

### V

■ Finally, Chapman appeals the district court's rulings that his confinement in segregation did not constitute cruel and unusual punishment violative of the Eighth Amendment until May 5, 1973, and that even after that date Chapman failed to demonstrate that he was entitled to damages for his unconstitutional punishment. While we agree that an Eighth Amendment violation has occurred, we reverse as to the date of its occurrence and Chapman's entitlement to damages.

■ In *Adams v. Carlson,* 488 F.2d 619 (7th Cir. 1973), we recognized that "punishment which is disproportionate to the offense committed constitutes cruel and unusual punishment, whether imposed without or within prison walls." *Id.* at 635–36. We further recognized that disproportionality is a question both of degree and of fact, and we gave some examples to illustrate our

---

**3.** The district court also found that a 1970 Federal Bureau of Prisons policy statement provided that a committed offender may abstain from eating those food items which are prohibited by his religion and that he may receive added portions from the main line of non-rationed items to make up any nutritional deficiency. Absent any affirmative act on the part of defendants to circumvent this policy, however, its mere existence does not take the case out of the *Rizzo* doctrine. *See Rizzo v. Goode,* 423 U.S. at 275–76, 96 S.Ct. 598.

thinking and to serve as benchmarks in future cases. We contrasted the case of an inmate who refuses an order to shave his beard with that of the mastermind of a large-scale escape attempt, noting that the former "does not ordinarily deserve solitary confinement." *Id.* at 636. Chapman's alleged "offense," if such it was, is clearly closer to the former than the latter example. It is questionable whether indeterminate segregation was at all appropriate for the type of offense charged. At the very least, the period of nearly *seven months* from October 11, 1972 to May 5, 1973 was manifestly disproportionate to the offense of failing to perform work as instructed, especially when viewed in light of the facts that the refusal was based on religious grounds, the pork was somehow removed by another through Chapman's efforts, he finished the task of cleaning the cart himself, and due to his attitude he was allowed to return to his work for the remainder of the day. It is also to be noted that at least as of March 9, 1973, the Bureau of Prisons had adopted a policy which prohibited assignment to kitchen clean-up detail of those prisoners who refused to handle pork on religious grounds; yet Chapman was not released from punishment for this "offense" until *over four months later*. The district court should consider these facts on remand in determining the extent of the Eighth Amendment violation.[4]

 The district court also erred in its denial of Chapman's claim for monetary damages based on the Eighth Amendment violation. The court found that plaintiff failed to show that actual damages were suffered, although it noted the conditions under which Chapman lived while confined

in segregation, including lack of exercise, lack of society with other inmates or family and friends, and lack of work or vocational training. We recently held in *Buise v. Hudkins*, 584 F.2d 223 (7th Cir. 1978), that such a list of conditions is sufficient to support a claim for damages, and we find that case to be controlling here. As we stated in *Buise*, "[a]dmittedly, it is difficult to move from these [conditions] to a compensatory dollar amount, but such difficulty cannot preclude an award of more than nominal damages. . . . Other courts have translated a series of conditions into a realistic dollar figure, and the district court should do so on remand." *Id.* at 233.

## VI

One additional matter requires our attention. Although we have held that defendants enjoy a qualified official immunity from monetary damages regarding Chapman's First Amendment claim, this does not extend to the Eighth Amendment violation. Indeed, it is arguable that the very nature of an Eighth Amendment violation would preclude the availability of a qualified official immunity defense. We need not reach that question, however, for, regardless of its theoretical availability, the defense may not be used here because defendants have failed to qualify under the *Wood* standards.

 There can be no serious contention with the fact that the right to be free from disproportionate punishment has long been "clearly established." At least as early as 1910, the Supreme Court declared it to be "a precept of justice" that punishment for crime must be proportioned to the offense, lest it be found to be cruel and unusual. *Weems v. United States*, 217 U.S. 349, 367,

---

4. Defendants assert that Chapman's remarks concerning the supervisor at Leavenworth properly may have been considered in determining the length of Chapman's confinement, even though defendants admit the Leavenworth investigation of the oven incident did not raise Chapman as a suspect. If the prison authorities had wished to charge Chapman with threatening another with bodily harm, they could have done so; it was, in fact, a separately listed "Prohibited Act" under Prison Code § 004. No such charge was ever made, nor was any hearing regarding it ever held. Defendant Pickett did not even reply to Chap-

man's request for a formal explanation of his confinement. The mere fact that the remark was listed in the violation report and the investigator's report is not sufficient. *Hayes v. Walker*, 555 F.2d 625, 633 (7th Cir. 1975), *cert. denied*, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977). Not having been communicated to Chapman as a ground for the decision, it may not properly be relied on as justifying the punishment of indeterminate segregation. *See United States ex rel. Richerson v. Wolff*, 525 F.2d 797 (7th Cir. 1975), *cert. denied*, 425 U.S. 914, 96 S.Ct. 1511, 47 L.Ed.2d 764 (1976).

30 S.Ct. 544, 54 L.Ed. 793 (1910). This being so, the question becomes one of whether defendants "knew or should have known" that their confinement of Chapman to segregation was or became grossly disproportionate to the offense with which he had been charged. But this question almost answers itself, for if a point in time can be determined when the punishment became so seriously disproportionate as to violate the Eighth Amendment, at that same point defendants "should have known" that the punishment was grossly excessive.[5] Thus, under the *Wood* standards, the defense of qualified official immunity is not available for damages arising out of Chapman's Eighth Amendment claim.

The judgment of the district court is affirmed in part and reversed in part; the cause is remanded for further proceedings consistent with this opinion.

---

5. The determination of that point in time is left to the district court on remand.