647 F.2d 727
 UPTOWN PEOPLE'S COMMUNITY HEALTH SERVICES BOARD OF
DIRECTORS, an Illinois not- for-profit
Corporation, Plaintiff-Appellee,
v.
The BOARD OF COMMISSIONERS OF COOK COUNTY and the County of
Cook, Defendants-Appellants,
v.
Patricia Roberts HARRIS, in her capacity as Secretary of the
Department of Health and Human Services,
* Defendant-Appellee.
 No. 80-2226.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 9, 1981.
Decided April 21, 1981.
Rehearing and Rehearing In Banc Denied May 29, 1981.
 
 Julia M. Nowicki, Asst. State's Atty., Chicago, Ill., for defendants-appellants.
 Mary A. Thomas, Asst. U.S. Atty., Robert C. Cordek, Asst. Regional Atty., Dept. of Health and Human Services, Frederick H. Branding, Asst. U. S. Atty., Chief, Civil Division, Chicago, Ill., for defendant-appellee.
 Before PELL and WOOD, Circuit Judges, and BONSAL, Senior District Judge.**
 William J. Hart, Chicago, Ill., for plaintiff-appellee.
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 This case involves the appeal of Cook County, Illinois and the Board of Commissioners of Cook County (referred to collectively as "Commissioners" or "County defendants") from the district court's adverse ruling on several contract claims that are part of a suit brought by the Uptown People's Community Health Services Board of Directors ("Board"). The suit presses federal and state pendent claims against the County defendants, and also names Patricia Harris in her capacity as Secretary of the U. S. Department of Health, Education and Welfare ("HEW") as a defendant in certain claims.[1] The district court decided only pendent claims. The County defendants contend as a threshold matter that the district court lacked pendent jurisdiction over the contract claims, and thus should not have ruled on them. We agree and therefore reverse and remand with instructions to dismiss the case.
 
 I.
 
 2
 This case centers on an agreement between the Commissioners and the Board that helped establish a community out-patient health clinic in the Uptown area of Chicago. The idea for the clinic began in 1977, when a group of Uptown residents determined that the health care needs of the community required locally available out-patient care, which at the time was not obtainable. The residents consulted with the Commissioners,[2] who oversaw the delivery of health care services in Cook County hospitals and out-patient facilities. The Commission was not receptive to the idea of bearing the full burden of financial assistance to the clinic, although it indicated a willingness to help. It appeared that grant money and other assistance to operate the clinic might be forthcoming from the National Health Service Corps ("NHSC") and HEW. NHSC is a federal program that provides medical personnel and equipment to clinics such as the one involved here. Under NHSC regulations, the salaries of NHSC personnel provided to the clinic need not be reimbursed to the government if a community group rather than a state agency applies for the grant money. Hence, the interested residents of Uptown formed the Board.
 
 
 3
 An HEW official informed the Commissioners and the Board that in order for the Board to qualify for a grant the two Illinois parties would need to sign a cooperation agreement, which they did. HEW is not a signatory to that agreement. The agreement is the center of this litigation.
 
 
 4
 The portion of the agreement relevant to this appeal states that the Commission is to provide "start-up monies" and "its counsel in management and administration of the clinic until the point in time that the clinic has reached economic self-sufficiency and the (Board) requests complete independence from the Commission."[3] When "the ultimate goal" of economic self-sufficiency is reached "the Commission shall have the right to relinquish its authority in the operation of the clinic" to the Board. In addition, the agreement established a liaison committee to channel interaction between the Commission and the Board on matters of clinic policy.
 
 
 5
 The Board contends that the agreement grants it a property right: present participation in and future control of the clinic upon the attainment of economic self-sufficiency. The Board says that certain actions by HEW and the Commission constitute a breach either of that agreement or of general fiduciary obligations, damaging the Board's present right to participate in the clinic's operation and its expectancy interest in gaining control of the clinic. This litigation focuses not on the quality of health care at the clinic, but rather on who will be in charge of the clinic if it can survive its internal turmoil.
 
 
 6
 The relationship between the Commission and the Board began to falter soon after the clinic opened. During informal and formal meetings, the NHSC- and Commission-provided staff charged that the clinic was being used to further the campaign for alderperson conducted by a Board member, Helen Schiller. In particular, the staff alleged that non-medical support staff began to miss a great deal of worktime as election day neared. Election canvassing allegedly was going on at the clinic. The clinic's medical director testified that one of the Board members, Walter "Slim" Coleman, indicated that he was pleased that the clinic had conducted a mobile hypertension screening program in the community, since it gave Coleman the opportunity to leave campaign material in a building that otherwise was off limits because it was run by Schiller's opponent. And during the campaign, the clinic receptionists increasingly found that patients were demanding free medical care or instant attention without an appointment, all on the basis of statements allegedly made to them by Board members.
 
 
 7
 Other staff complaints centered around Board-appointed "patient-advocates" who allegedly manipulated the information on patient intake forms so that some patients would qualify for lower rates or free medical care under the clinic's sliding fee scale, when in fact the patients earned sufficient income to pay for medical services at a higher rate. The staff also complained that the patient-advocates questioned the physicians' medical judgment within hearing of the patients. There was a general complaint that the patient-advocates acted as spies for a community political action group.
 
 
 8
 The staff expressed special concern over a Family Health Plan proposed by the Board. No one opposed the idea in the abstract, but the proposal set forth by the Board would entail extensive funding for expansion into new areas, which the staff felt was unwise given the shortage of staff and equipment in existing areas of clinic operation. Perhaps most disturbing to some was that the document setting forth the Plan appeared to be more a political polemic than a proposal for effective medical care. The document asserted that the Board represented "a community that is under attack" and "fighting for its survival." This required "an organized consumer base," a term that seemed ill-defined and not directly related to health care.
 
 
 9
 Tensions simmered, and eventually the executive director of the Commission announced the Commission's intention to "divorce" the Board and run the clinic on its own until a new community Board could be created or the present one reconstituted. The Board responded by charging that the Commission had failed to inform the Board of the depth of staff dissatisfaction. The Board concluded that the medical director had not handled staff complaints in the best way, and had actually exacerbated problems to put the Board in a bad light. Especially galling to the Board was the Commission's alleged failure to utilize the liaison committee provided for in the agreement as a way to foster co-operation. There also was concern that the medical director had undermined the Board's relationship with the clinic's grantors by presenting the Board in an unfavorable light to HEW and others.
 
 
 10
 As a result of the friction generated between the Board and the Commission, one potential grantor withdrew its approval of funds to implement the Family Health Plan described earlier. The NHSC personnel eventually wrote to HEW stating that they would no longer continue with the clinic unless the Board was reconstituted. The Commission received a communication from HEW saying that HEW would support the Commission's attempts to create a new Board. HEW then held up payment of a grant to the Board, since it no longer recognized the Board as a grantee. The present litigation commenced.
 
 II.
 
 11
 The Board filed a six-count complaint. Count One alleges in general terms that HEW violated statutes creating the NHSC program, unspecified regulations governing the administration of NHSC, and the terms of the NHSC grant. Count Two alleges that the Commissioners acted with HEW to deprive the Board "of its property without due process of law" in violation of the Fifth and Fourteenth Amendments to the federal Constitution and of the Civil Rights laws, namely 42 U.S.C. §§ 1983 and 1985(3).
 
 
 12
 Count Three alleges in general terms that the Commissioners breached their agreement with the Board, and is wholly a state claim. This is the Count on which the district court focused. Count Four alleges that the Commissioners have breached "their obligations of trust" to the Board, and that HEW participated in that breach.
 
 
 13
 Counts Five and Six allege breaches of Article I, § 10 of the United States Constitution (the Contract Clause) and Article I, § 2 of the Illinois Constitution.
 
 
 14
 The Complaint asks that the district court "(d)eclare that the agreement between the (Board) and the (Commissioners) is binding against all agencies like HEW and that these agencies must honor their commitments to the (Board) and deal only with the (Board) with regard to the (clinic)." The Complaint also seeks unspecified monetary damages and an order enjoining the allegedly wrongful conduct described in the Complaint.
 
 
 15
 Both the County and federal defendants moved to dismiss or for summary judgment, raising jurisdictional objections and legal defenses. The jurisdictional contentions asserted that there was no substantial federal claim to which the state claims could be pendent. The district court denied the motions, stating that the case was "not ripe for disposition" at that time.
 
 
 16
 Having failed to obtain a determination on the motion, federal defendant Harris submitted a motion to require a more definite statement. The motion articulated line by line through the Complaint what was needed to determine if a cause of action had been alleged. The district court granted the motion in full by ordering the Board to amend its Complaint by a specified date. The Board never complied with the district court's order. The Complaint remains on appeal as it stood at the time of the filing.[4]
 
 
 17
 The case proceeded to trial only on the state claim questions of whether the agreement was a contract and, if so, whether the County defendants unreasonably violated the contract. The federal defendant did not participate in this hearing on the state claims.
 
 
 18
 The district court concluded that the agreement constituted a contract and that the Commission breached its duties under the agreement. While it discussed the federal claims in terms of their jurisdictional significance, the district court did not render judgment on them. This case is before us pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, and claims against federal defendant Harris remain before the district court.
 
 III.
 
 19
 In a case that does not involve diversity of citizenship, a federal district court may exercise its discretion to consider state law claims only when they arise out of the same nucleus of operative fact that supports the court's jurisdiction of a substantial federal claim, and the federal and state claims are such that the plaintiff "would ordinarily be expected to try them all in one judicial proceeding." United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The district court in this case incorrectly concluded that it had pendent jurisdiction over the state claims. No substantial federal claims were alleged in the Complaint, so there was nothing to which the state claims could be pendent.
 
 
 20
 To begin with, the district court utilized an improper procedure to reach its determination on the substantiality of the federal claims. When the defendants asked the district court to determine as a preliminary matter whether it had jurisdiction of the Board's federal claims, the district court stated that the issue was not "ripe." But the issue of jurisdiction always is the threshold determination for a court, Hagans v. Lavine, 415 U.S. 528, 538-39, 94 S.Ct. 1372, 1379-80, 39 L.Ed.2d 577 (1974), and may be especially important where, as here, the plaintiff who seeks to invoke federal jurisdiction alleges extensive state claims.
 
 
 21
 The proper procedure was followed in Comtronics, Inc. v. Puerto Rico Telephone Co., 409 F.Supp. 800 (D.P.R.1975), where the court dealt with state contract claims and an allegation that the public telephone company had breached the private plaintiff's contractual rights without due process. The plaintiff's claims depended on state contract law, a determination that would have to be made in the exercise of pendent jurisdiction. The court in Comtronics concluded that it could not first determine the state law issues in a broad hearing, since "we need a jurisdictional basis before we can entertain the contractual state claim. We can not determine first if any contractual rights actually exist in order to then base jurisdiction on their unconstitutional deprivation." 409 F.Supp. at 811 (emphasis in original).
 
 
 22
 In the case before us, the district court should have made the initial determination on the pleadings, as did the court in Comtronics, whether or not a substantial federal question was alleged. Gibbs, supra, 383 U.S. at 727, 86 S.Ct. at 1139. The district court should not have put off consideration of the substantiality of the federal claims, hoping to find the answer after a full trial on the state claims. Otherwise, the "considerations of judicial economy, convenience and fairness to litigants" that underlie pendent jurisdiction, id. at 726, 86 S.Ct. at 1139, are a nullity. In this case, the Commissioners were forced to trial on state claims when it was not clear that the court hearing the case had jurisdiction. The six-day trial on the contract claims might have resulted in the case being dismissed for lack of jurisdiction, a thorough waste of judicial resources. The district court should have determined at the outset, in a more limited proceeding, whether or not the Complaint alleges substantial federal questions so as to make pendent jurisdiction appropriate.[5]
 
 
 23
 Since the determination of whether or not jurisdiction exists is one of law to be determined from the pleadings, we may consider on this appeal whether the Board's allegations state a substantial federal claim. Molina-Crespo v. Califano, 583 F.2d 572 (1st Cir. 1978). Because even one substantial federal claim may be enough to support jurisdiction, we will consider whether the allegations against the state defendants and the federal defendant establish the district court's jurisdiction.
 
 The State Defendants
 
 24
 The Complaint alleges the state's violation of 42 U.S.C. §§ 1983 and 1985(3), and the Contract Clause of the federal Constitution. The district court did not address the § 1985(3) or Contract Clause claims. Neither claim establishes federal jurisdiction.
 
 
 25
 It is settled that § 1985(3) requires that the alleged deprivation of rights be based on "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." Griffin v. Breckinridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971); Elbert v. Board of Education of Lanark Community Unit, 630 F.2d 509 (7th Cir. 1980), cert. denied, -- U.S. --, 101 S.Ct. 1741, 68 L.Ed.2d 226 (1981). The Complaint does not remotely allege a class affected by the Commission's actions; indeed, it is only the Board's rights that are being asserted in this case. The Complaint does not state a claim under § 1985(3).
 
 
 26
 The federal Contract Clause is irrelevant to the jurisdiction question in this case, since it is pleaded in anticipation of a defense that the state law eliminating the former Health and Hospitals Governing Commission, see note 2, supra, also avoided or negated its obligations under the agreement at issue here. Such an allegation is not sufficient to establish federal jurisdiction. To the extent that the Contract Clause claim might be interpreted to allege a mere breach of contract, it does not raise a constitutional issue. E & E Hauling, Inc. v. Forest Preserve Dist. of DuPage County, 613 F.2d 675 (7th Cir. 1980).
 
 
 27
 The § 1983 claim is equally without merit. We view the pleadings on this contention with special care. As counsel for the Board candidly stated at oral argument, the case is one that turns solely on state law, and the Board seeks a trial in federal court because it believes it will receive a more sympathetic ear in this forum. Federal courts must be cautious when considering § 1983 claims to avoid results that imply that "every legally cognizable injury which may have been inflicted by a state official acting under 'color of law' establish(es) a violation of the Fourteenth Amendment." Paul v. Davis, 424 U.S. 693, 699, 96 S.Ct. 1155, 1159, 47 L.Ed.2d 405 (1976) (context of asserted liberty right to reputation). See Meachum v. Fano, 427 U.S. 215, 216, 96 S.Ct. 2532, 2534, 49 L.Ed.2d 451 (1976) (not every "grievous loss visited upon a person by the state is sufficient to invoke the procedural protections of the due process clause"). We must be particularly wary of subjecting to federal judicial review the "wide spectrum of discretionary actions that traditionally have been the business of" state health care administrators rather than of federal courts. See id. at 224-25, 96 S.Ct. at 2538 (context of state prisoner's right to hearing before undergoing prison transfer).
 
 
 28
 The starting point for the analysis of the § 1983 claim is whether the agreement conferred on the Board a constitutionally protected right. Holbrook v. Pitt, 643 F.2d 1261, at 1276-77 (7th Cir. 1981). See Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (discussion in context of liberty interest). In its answer to the County's motion for a more definite statement of allegations, the Board explained that the right it asserted was a property interest in continued operation and potential future ownership of the clinic. This property right allegedly derived from the agreement that is at issue in this case.
 
 
 29
 State deprivations of property rights are cognizable under § 1983. See Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972). In Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Court discussed the attributes of property rights in holding that employment contracts entered into by a state may confer on the employee interests that are protected under the Fourteenth Amendment from deprivation without procedural safeguards. The property interest in a state benefit, such as the one asserted here, attaches when a person has "more than an abstract need or desire for it (and) more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement." Roth, supra, 408 U.S. at 577, 92 S.Ct. at 2709. There must exist "rules or mutually explicit understandings that support his claim of entitlement." Perry, supra, 408 U.S. at 601, 92 S.Ct. at 2698, citing Roth, supra, 408 U.S. at 577.
 
 
 30
 The procedural protection of property afforded by the Fourteenth Amendment "is a safeguard of the interests that a person has already acquired in specific benefits." Roth, supra, 408 U.S. at 576, 92 S.Ct. at 2708. See L. Tribe, American Constitutional Law 518-19 (1978). In order to state a claim cognizable under § 1983 based on a right to future ownership, the Board had to show that the agreement created an entitlement understood to be such by both it and the Commissioners to run the clinic upon its attainment of economic self-sufficiency. That it failed to do.
 
 
 31
 The agreement on its face creates no absolute right in the Board to obtain exclusive control of the clinic. The introductory portions of the agreement recite the Commission's desire to foster local ambulatory health care in medically underserved areas, and the Board's desire to independently operate the clinic. This portion of the agreement also notes the Board's need of the large capital investment and management assistance necessary to operate the clinic. To this end the Commission agrees in Clause One of the agreement to provide money and "its counsel in management and administration of the clinic until the point in time that the clinic has reached economic self-sufficiency and the Uptown Community Board requests complete independence from the Commission." There follows a one-sentence definition of the meaning of "economic self-sufficiency." See note 3, supra. Then the agreement continues: "Thus, the Commission shall have the right to relinquish its authority in the operation of the clinic upon the demand and tender of the Uptown Community Board" of the debts owed to the Commission, or the Commission's forgiving the debts.
 
 
 32
 The parties agree that these are the critical passages in the agreement. The Board, as noted, contends that the agreement gives it an absolute right to operate the clinic on its own upon the attainment of self-sufficiency and the repayment or forgiveness of the debts. The language of the agreement, however, cannot be made to bear that interpretation.
 
 
 33
 The Board must request independence from the Commission. It "(t)hus " becomes the Commission's "right to relinquish its authority." (Agreement Clause One, emphasis added.) There would be no need for the explicit requirement that the Board must request its independence if the Board had an automatic right to control when other conditions were met. Indeed, the only right that is set forth in regard to the Board's exclusive operation of the clinic is that of the Commission to relinquish its authority under the agreement. The Board may request that the Commission so exercise its right, but the plain terms of the agreement do not require that the Commission comply.
 
 
 34
 Other language in the agreement upon which the Board relies for its interpretation includes the introductory portion that relates the Commission's interest in having locally operated clinics and the Board's desire to independently run one. The district court also pointed to a provision of the agreement that states "the ultimate goal (of the agreement is) ownership and control by the (Board)." This language merely expresses the goal of the agreement's signatories. This expression of a goal and the desire to attain it does not, however, rise to the level of an explicit mutual expectancy that the Board is entitled to acquire the clinic for its exclusive use upon meeting the agreement's conditions. Roth, supra, 408 U.S. at 577, 92 S.Ct. at 2709. Cf. Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (no explicit guarantee of continued employment in contract or under state statutes). The parties obviously entered the agreement with the hope that things would work out the same way as the teacher and the University in Roth presumably entered the employment contract in that case with similar high hopes. But an intent to have the agreement succeed does not confer a property right to force the Commission to act as though it had succeeded, especially here, where the agreement on its face leaves the ultimate decision to the Commission. This interpretation of the agreement would permit the Commission, even after the clinic was currently self-sufficient, to determine in keeping with its own public responsibilities that to assure continued self-sufficiency in the future and the proper delivery of health care that it should continue at least for some additional time to maintain a share of control. Some of the evidence concerning the conduct of the present Board suggests the wisdom of the drafters of the agreement in leaving a share of discretion with the Commission in spite of the original high expectations of all the parties.
 
 
 35
 The final provision of the agreement to which the Board turns for support states that the "Commission will maintain and help to facilitate the development of the clinic until economic self-sufficiency is achieved." This vests no additional right in the Board, although the Board claims that the provision shows a guarantee of future ownership. The quoted provision makes explicit that the Commission's financial responsibility ends when the clinic is able to sustain itself, and is directed at assuring assistance for expenditures that may arise in the course of the clinic's operation but which may not be provided for in the agreement. The provision does not say that the Commission's operation of the clinic must cease at that time. The physical placement of the provision within the agreement makes clear that it relates to financial considerations: it follows several provisions that deal with the lease and purchase of the building that houses the clinic. The provision does not suggest a requirement that the Board receive full ownership upon request.
 
 
 36
 Since the plain language of the agreement taken as a whole assumes a clear, unambiguous meaning that the Board did not have a protectible property interest in future operation of the clinic, there was no need to go beyond the agreement's text in order to interpret its meaning. Goldblatt Bros. v. Addison Green Meadows, Inc., 8 Ill.App.3d 490, 290 N.E.2d 715 (1972). We note, however, that the evidence presented at the hearing in this case and relied upon by the district judge does not conflict with the plain language of the agreement. For example, the notes of one meeting of the principals reads that the clinic "will lease the center from the bank until the community buys the building," which is said to show that it was intended for the Board to eventually own the clinic. To begin with, everyone agrees that the parties intended that the relationship would succeed and the Board would own the clinic. As we have concluded, however, that general intent does not show that the agreement conferred a protectible property interest in future ownership for § 1983 purposes, since the Commission retained the right to make the ultimate decision. Moreover, since the agreement itself required that the Commission assist the Board to buy the building, the meeting's notes are merely cumulative of the language in the agreement, which we have already stated does not demonstrate the asserted property interest.
 
 
 37
 The minutes from another meeting indicate that the Commission felt a duty to teach the Board how to administer the clinic so that the Board would be ready to operate the clinic "when it becomes necessary." This merely conforms to what we have said before: the goal and hope of the parties to the agreement was that the Board would one day be able to own the clinic, and administrative training was appropriate to that end. This is insufficient to create a property interest cognizable under § 1983, since the parties' "intent" did not amount to a requirement that the Commission turn the clinic over to the Board: discretion to do so was reserved exclusively in the Commission.[6]
 
 
 38
 The district court stated that testimony of certain former Commissioners shows "that it was always contemplated and intended" that the Board would own the clinic. Commissioner Ayala's testimony merely says that it was intended that "all the clinics will eventually end up to be self-sufficient." Since self-sufficiency only established the point at which the Board was entitled to request its independence, but did not mandate that the Commission grant independence, Commissioner Ayala's testimony does not prove the Board's point.
 
 
 39
 The portion of Commissioner Fritzsche's testimony to which our attention is directed simply states that there are mutual promises in the agreement. While her testimony may go to whether or not the Commissioner thought a contract existed, it says nothing about what the nature of those promises is, and her other testimony makes clear that she did not think that one of the promises involved the Board's asserted automatic right to ownership of the clinic.[7]
 
 
 40
 An entitlement may be created by the operation of state law as well as by the terms of the agreement. See Bishop, supra, 426 U.S. at 344, 96 S.Ct. at 2077. Principles of Illinois law provide no basis for the Board's claim to procedural protections. The agreement specifies no termination date other than the time of the Commission's acquiescence to the Board's request for independence upon the attainment of economic self-sufficiency. "It has long been the holding of the Illinois courts that when an executory contract fixes no time for its operation, it is terminable at the will of either party," and without notice. Kraftco Corp. v. Koblus, 1 Ill.App.3d 635, 640, 274 N.E.2d 153 (1973). In Steinberg v. Kepper-Nagel Real Estate Investments, Inc., 14 Ill.App.3d 619, 303 N.E.2d 46 (1973), the court concluded that a real estate sales contract containing a termination date of 180 days after the lifting of an apartment rezoning moratorium at some unidentified future time did not state a definite time limit to the agreement. In the absence of such a time limit, the executory contract was terminable at will. Id. at 622, 303 N.E.2d at 48.
 
 
 41
 The present case involves a situation analogous to that in Steinberg. The Board's asserted future "property right" depends upon the attainment of a tenuous goal not within control of either party to the agreement, namely, economic self-sufficiency. That aspect of the agreement, wholly executory and standing alone, would be subject to termination at will and without notice by either party under Illinois law. The absence of a right to a hearing under state law or the terms of the agreement is fatal to the claim for § 1983 purposes. See Bishop, supra, 426 U.S. at 344-45, 96 S.Ct. at 2077.
 
 
 42
 The case of Maimon v. Telman, 40 Ill.2d 535, 240 N.E.2d 652 (1968), cited by the district court to support its contrary conclusion, is inapposite. The Maimon case dealt with the question of whether or not a joint venture existed between the parties to an agreement. If a joint venture was found to exist, the agreement would be held to remain in force until its purpose was accomplished or no longer possible. As the Court indicated, however, joint ventures present a virtually unique circumstance in that respect. In other situations, such as partnership, the agreement would be terminable at will. Id. at 538, 240 N.E.2d at 655. In the present case, aside from a single conclusory allegation in the Complaint, the record does not suggest that the Commission and the Board were joint venturers. Since the agreement thus was terminable at will and without notice, the Board had no right to procedural protections, cognizable under § 1983, to assert against the Commission's decision to "divorce" the Board.
 
 
 43
 There are no "rules or mutually explicit understandings" that support the Board's claim of entitlement to future ownership of the clinic. See Perry, supra, 408 U.S. at 601, 92 S.Ct. 2699. Nor does state law provide that an agreement for such future ownership could not be terminated without notice. See Bishop, supra, 426 U.S. at 344-45, 96 S.Ct. at 2077. The portion of the agreement relating to future ownership of the clinic, then, did not confer a property right on the Board so as to create federal jurisdiction under § 1983.
 
 
 44
 The Board's response to the County defendants' motion for a more definite statement alleges the Board's property right in the "continued operation of" the clinic. In support of the existence of such a property right[8] the Board points to its responsibilities under the agreement for the clinic's billing and collection activities, and for participation on the liaison committee established to make "major policy decisions" regarding the clinic.
 
 
 45
 It is true that under the agreement, the "Board is responsible for all billing and collecting." The Commission, however, is to provide "assistance until the clinic develops the capability to do its own billing and collecting independently." Moreover, the agreement states that the Commission is to establish the accounting procedures to be used, and that the Board must implement those procedures. The portion of the agreement that deals with billing and collecting does not create a property right in the Board for jurisdiction purposes any more than does the portion related to future ownership. Until the clinic "develops the capability" to bill and collect on its own, the agreement is clear that the authority to do so resides for all practical purposes with the Commission. Evidence presented at the hearing on this point supports the plain language of the agreement. In particular, the record shows that the Board took no part in billing or collecting procedures, and that the Commission declined to allow it to do so when the Board requested responsibility in the area. The record does not indicate that the Board raised the issue with the liaison committee, as it might be expected to do on a matter such as this. The Board only submitted a questionnaire to the committee seeking an accounting and a report of billing to aid in "an understanding of accounts receivable." The practice of the parties thus reflects the scope of the Commission's authority set forth in the agreement.
 
 
 46
 The Board's authority to participate on the liaison committee likewise is insufficient to establish a property right for purposes of stating a federal claim. Both parties retained veto power over any decision made by the committee, but this was a significant limit only on the Board's potential authority under the agreement. The agreement explicitly states that the Commission's authority over administration of the clinic derives from its exclusive responsibility to employ personnel to fill the highest positions in the clinic, as well as from its participation on the liaison committee. By contrast, the Board may exercise its administrative responsibilities only through its participation on the liaison committee, the decisions of which are, of course, subject to veto by the Commission. Thus, the agreement establishes that the Board's only viable interest in the operation of the clinic is what the Commission grants it by declining to veto liaison committee decisions. The Commission, on the other hand, retains authority to operate without input from the Board.
 
 
 47
 Whatever rights the agreement grants to the Board, they are not property rights cognizable under § 1983 as alleged in the Complaint.
 
 The Federal Defendant
 
 48
 The district court has not yet dealt with the adequacy of the claims presented against federal defendant Harris. But pendent jurisdiction on the state claims against the County defendants could not be exercised absent a substantial federal question. In light of our conclusions on the federal claims against the County defendants we must address the allegations against Harris. The peculiar posture of this case thus makes it necessary to decide whether the Complaint states a substantial federal claim even though Harris is not a party to this appeal in the usual sense.[9]
 
 
 49
 Count One of the Complaint alleges that "HEW representatives have violated" unspecified statutes that created NHSC, "the regulations, rules and guidelines" HEW enacted to administer NHSC programs, and "the terms of the grant or assignment of NHSC personnel" to the clinic. Counsel for Harris requested a more definite statement, contending that these vague and conclusory allegations fail to specify adequately the basis of the Board's complaint against HEW. The district court agreed and ordered the Board to respond by May 5, 1980 to each of the very specific requests for explanation presented by HEW. The Board is in default of that order, never having tendered a response.
 
 
 50
 The district court was correct in determining that the allegations were indefinite. While it is true that "notice pleading" is an integral part of the federal rules governing pleading, it still is necessary that something be stated that apprises a defendant of the substance of the allegations. Cohen v. Illinois Institute of Technology, 524 F.2d 818 (7th Cir. 1975), cert. denied, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976); French v. Corrigan, 432 F.2d 1211 (7th Cir. 1970), cert. denied, 401 U.S. 915, 91 S.Ct. 890, 27 L.Ed.2d 814 (1971); 2A Moore's Federal Practice P 8.17(4.-1). If the simple statement that HEW violated unspecified regulations and statutes is sufficient to state a claim in this context, then virtually every complaint filed against the national government, however meritless, would confer jurisdiction over pendent claims, placing undue strain on the concept of federalism. This concern is especially significant in this case since even the extensive factual allegations in the Complaint do not shed light on which aspects of HEW's conduct relate to Count One, and which relate to fiduciary and other obligations allegedly breached under other Counts. Notice pleading still requires fair notice. See Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Count One is not sufficiently definite to state a substantial federal claim.
 
 
 51
 The allegations in Count Two that HEW violated the Board's right to due process under the Fifth Amendment and in concert with the Commissioners likewise fail to state an adequate claim. The Board is in default of the district court's order to more clearly state its claims against the federal defendant in this Count. Nevertheless, taking the Board's answer to the County defendants' request for a more definite statement on Count Two as treating the thrust of HEW's request, it is clear that the allegations are inadequate. The property right alleged to exist in the agreement has no more substance when asserted against the federal defendant than when aimed at the Commissioners. Count Two fails to state a federal claim.
 
 
 52
 The vague allegation in Count Four that "HEW acting by and through its duly authorized agents and employees has participated in (the Commissioners') breach of trust" is insufficiently definite to state a claim. The district judge so concluded when he directed the Board to amend its Complaint in response to Harris's motion to make more definite the allegations concerning the manner in which Harris participated in the alleged breach of trust and the specific basis of HEW's fiduciary obligations to the Board. The Board declined to comply with the district court's order. The Board's response to the County defendants' request for a more definite statement does not elucidate the nature of Harris's participation. The allegations that the Board thus places before us fail adequately to specify the acts of which the Board complains, and fail to state a claim upon which federal jurisdiction may be grounded.
 
 IV.
 
 53
 The Complaint fails to allege a substantial federal claim. The district judge therefore had no jurisdiction to decide the Board's pendent claims. The district court did not consider whether the County defendants breached fiduciary duties owed to the Board in the absence of the asserted property interests. Even though some state claims were heard below, and it is our usual practice in that situation to reach the merits of the state claims, see Parrent v. Midwest Rug Mills, Inc., 455 F.2d 123 (7th Cir. 1972), we decline to do so here where the record is inadequate to make a determination and the question has not been briefed on appeal. Accordingly, the district court's decision is reversed and remanded with directions to dismiss the Complaint without prejudice to the Board's bringing the state claims alleged therein in state court, where they belong.[10]
 
 
 
 *
 Referred to in this opinion under the former name of Department of Health, Education and Welfare
 
 
 **
 The Honorable Dudley B. Bonsal, Senior District Judge of the Southern District of New York, is sitting by designation
 
 
 [1]
 While Harris is the named federal defendant, the Complaint specifies no actions taken by her or on her behalf. The Complaint variously attributes the acts complained of to HEW as an entity and to unnamed representatives of HEW. The Commission cites cases suggesting that Harris could not be liable for monetary damages under 42 U.S.C. § 1983 as a participant with the state unless she played an affirmative role in the deprivation of the Board's rights. See, e. g., Chapman v. Pickett, 586 F.2d 22 (7th Cir. 1978); Adams v. Pate, 445 F.2d 105 (7th Cir. 1971). The § 1983 issue is not dispositive of all claims pressed against Harris, and neither side to this controversy argued the extent to which declaratory or injunctive relief could be applied to Harris for the actions of HEW personnel. We need not and do not decide that issue
 
 
 [2]
 At the time, the Commission was called the Health and Hospitals Governing Commission. That entity was legislated out of existence in 1979, with the present defendant Commissioners assuming the former Commission's rights, duties and obligations. Ill.Rev.Stat. Ch. 34, § 5020, as amended P.A. 81-1197, § 10 (1979)
 
 
 [3]
 The agreement defines "economic self-sufficiency" as a six-month period wherein the clinic's revenues exceed its operating costs by ten percent of the latter amount. The record shows that the clinic has not reached economic self-sufficiency
 
 
 [4]
 The Board filed a detailed response to the Commission's motion for a more definite statement on the claims relating to the County defendants. The district court declared moot the Commission's motion on the basis of that response
 
 
 [5]
 Cf. Kimbrough v. Arkansas Activities Assoc., 574 F.2d 423 (8th Cir. 1978) (where district court disposed of case on non-federal grounds without addressing substantiality of federal claims at all, substantiality determination implied for purposes of appeal)
 
 
 [6]
 The Board asserts that a document prepared by the physician responsible for patient care at Cook County medical facilities shows that self-sufficiency was a realistic goal, soon-to-be realized. In fact, the document merely presents a general "perspective" on how to go about achieving self-sufficiency and specifically notes that the clinic is operating at a $400,000 annual deficit. Since testimony taken in this case indicates that none of the Commission clinics was ever self-supporting, there could be no reasonable expectation based on past County practice that the change in ownership would be automatic. See Perry, supra, 408 U.S. at 602-03, 92 S.Ct. at 2700. And the Board's assertion in its brief that it would not have undertaken the work necessary to start the clinic unless it expected eventually to own the clinic merely suggests a unilateral expectation on its part, insufficient for § 1983 purposes to show a protectible property interest. See Roth, supra, 408 U.S. at 577, 92 S.Ct. at 2709
 
 
 [7]
 Commissioner Fritzsche testified that "the whole agreement is based on the hope that such an agreement can work, and as soon as the working relationship no longer is possible, I think that then you must have powers to undertake steps to safeguard the operation of the clinic." The Commission has maintained funding for the clinic, which is continuing to provide medical care to the Uptown community
 
 
 [8]
 Neither the parties nor the district court directly addressed the possibility that the allegation regarding a right to "continued operation" provides a basis for § 1983 jurisdiction. The allegation was addressed, however, in connection with the issue of whether the agreement constituted a contract, and that discussion provides ample basis for our consideration of the jurisdiction issue
 
 
 [9]
 Defendant Harris submitted a brief in this appeal styled as a "Statement of Position." Government counsel presented Harris's position at oral argument
 
 
 [10]
 On February 26, 1981, the County defendants filed a motion to stay the district court's judgment. In light of our disposition of this case, we deny the motion as moot