**Edward Joseph X. CHAPMAN, Plaintiff-Appellee,**

v.

**George W. PICKETT, Warden, U.S. Penitentiary, Marion, et al., Defendants-Appellants.**

**Nos. 84–2842, 84–2913.**

United States Court of Appeals, Seventh Circuit.

Argued March 31, 1986.

Decided Sept. 15, 1986.

As Amended Sept. 25, 1986.

James A. Lewis, U.S. Atty., Springfield, Ill., for defendants-appellants.

David Anderson, Northwestern University Legal Clinic, Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, CUDAHY and EASTERBROOK, Circuit Judges.

CUDAHY, Circuit Judge.

After refusing on religious grounds to clean pork off food trays, plaintiff, a prisoner at the federal penitentiary in Marion, Illinois, was held in segregated confinement for nine months. He filed suit contending that the punishment was excessive. After numerous trials and appeals, this court determined that defendants—officials at the prison—had violated plaintiff's eighth amendment rights. On remand, the district court for the Central District of Illinois found defendants individually liable to plaintiff for $7,000. Defendants appeal the size of the award and the finding of individual liability. Plaintiff cross-appeals the award—arguing that it is too small—as well as the district court's failure to grant punitive damages. We affirm.

Edward Joseph X. Chapman was convicted in 1969 of armed robbery and sentenced to 20 years in prison. He was originally detained at the federal penitentiary in Lewisburg, Pennsylvania, then at Leavenworth, Kansas, before being transferred to the Marion Penitentiary on October 4, 1972. On October 9, 1972, Chapman was assigned to kitchen detail. This included removing trays from food carts and cleaning off the carts. Because the food trays had pork on them, plaintiff, a devout Black Muslim whose faith forbids any handling of pork, refused to perform the task. James E. Brown, the supervising officer, warned Chapman that if he did not complete his assignment he would receive a disciplinary citation. Chapman still refused and told Brown that the last person who had written a disciplinary report on him had been "blown out of an oven" at Leavenworth two months earlier.[1]

Brown filed a report with the prison's Adjustment Committee under Prison Code section 303, charging Chapman with "failing to perform work as instructed by supervisor." This report noted Chapman's religious grounds for refusing to work. The report also mentioned Chapman's remark about the Leavenworth incident, although Chapman was not charged with threatening an officer. That same day, an investigation by a member of the Adjustment Committee concluded that Chapman generally had a good attitude and noted that Chapman had found another prisoner to remove the pork and had afterwards completed the task. Chapman also performed his kitchen tasks the following two days without incident.

On October 11, 1972, the Adjustment Committee met on Brown's report and concluded that Chapman should be placed in segregated confinement for an indeterminate period. Thereafter, Chapman's status in segregated confinement was reviewed regularly. At one point, he wrote Warden George W. Pickett and requested immediate release and an explanation of why he was in segregation. This inquiry was not answered. On March 15, 1973, Warden Pickett received a copy of a letter dated March 9, 1973 from the Director of the Federal Bureau of Prisons, Norman A. Carlson, in which the director told Congressman Charles Rangel that prisoners should not be assigned to details involving the handling of pork if their religious beliefs forbade it. Despite this letter, Chapman remained segregated. He was returned to the general population on July 25, 1973, after spending 289 days in segregation.

While in segregation, Chapman had no social contact with other inmates. Many of his religious materials were confiscated and he had no opportunity to attend religious services. While prisoners in the general population were allowed out of their cells up to 12 hours a day, Chapman was only allowed out for exercise a few times each week and then only for 15 to 30 minute intervals. He was unable to bathe as frequently as those in the general population, was unable to request food that complied with his religious dietary restrictions, and received no vocational training.

He initially filed suit in April 1973. After much litigation,[2] this court found Chap-

1. In fact, an employee was involved in an oven accident at Leavenworth, but Marion officials were aware that Chapman was not suspected of involvement in the incident.

2. Chapman originally sought declaratory and injunctive relief and damages, alleging violations of his rights under the first amendment's free exercise clause, the fifth amendment's due process clause and the eighth amendment's prohibition against cruel and unusual punishment. After hearing from only two witnesses, the district court entered judgment for defendants on grounds that Chapman failed to prove any of

the allegations in his complaint and that his claim for a mandatory injunction was moot because he had already been released from segregation. On appeal, this circuit affirmed the denial of a mandatory injunction ordering release but reversed the dismissal of claims for damages and for certain declaratory and prohibitory relief. *Chapman v. Kleindienst*, 507 F.2d 1246 (7th Cir.1974). The court held that Chapman had made a prima facie case for a first amendment violation, that he had received procedural due process and that the district court had erred in terminating testimony. The court made no determination on Chapman's

man's eighth amendment rights to have been violated by his extended confinement in segregation. *Chapman v. Pickett,* 586 F.2d 22 (7th Cir.1978). The case was then remanded to the district court for determination of who was responsible for the eighth amendment violation, when the violation began and what damages Chapman should receive.[3]

The district court determined that segregating Chapman for more than one week for failure to work was impermissible. Based on prior awards for wrongful segregation, the district court determined that Chapman should receive $7,000. The court determined that the three members of the Adjustment Committee, Jack Culley, E.M. Cage and Earl Buzzard were individually liable because they made the determination that Chapman should be segregated for an indefinite period. The court found Deputy Warden Fred Frey liable for approving this indeterminate sentence. The court also found Warden Pickett liable, based on the specific facts to which he had stipulated. Pickett admitted having the authority to override the Adjustment Committee's determination. He admitted knowing of plaintiff's confinement after October 11, 1972. He also knew of Norman Carlson's letter stating that individuals should not be forced to handle meat in violation of their religious beliefs.

The district court did not award plaintiff punitive damages, finding that the officers had not acted with malice and that they legitimately believed that Chapman had threatened Officer Brown. Defendants now appeal the award of more than nominal damages to Chapman, contending that

evidence of Chapman's threat should be considered in assessing the reasonableness of his confinement. Defendants also contend that they should not be held individually liable. Chapman cross-appeals contending that the award of actual damages was too small in light of the length of his confinement and claiming that his treatment warranted punitive damages.

## I.

Defendants first argue that Chapman is not entitled to more than nominal damages because, even if he was wrongfully confined for refusing to work on religious grounds, his comment that the last man who had written a disciplinary report on him had been blown out of an oven provided a reasonable basis for his long-term segregation. Defendants note that this comment was in Officer Brown's report and was admitted by Chapman before the Adjustment Committee. As Chapman was an armed robber confined in a maximum security prison, defendants contend, it was reasonable to take his comment seriously and keep him under stricter supervision for 289 days. Thus, under *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)—which holds that damages are only recoverable when a deprivation of a right would not have occurred absent a constitutional violation—they conclude that Chapman is entitled to no more than nominal damages.

 In raising this argument, defendants attempt to circumvent the settled law of this case. In 1978, this circuit stated:

---

eighth amendment claim due to the inadequacy of the record. It remanded the case for a new trial.

On retrial, the district court ruled that qualified immunity shielded defendants from Chapman's first amendment claim. It found that plaintiff's eighth amendment rights were violated but refused to award money damages because no actual damages were shown. On appeal this court affirmed the finding of an eighth amendment violation and the determination that the first amendment claim was barred by qualified immunity. The court reversed the finding that no actual damages had been shown.

**3.** On remand the district court determined that no eighth amendment violation existed in light of *Rummel v. Estelle,* 442 U.S. 939, 99 S.Ct. 2879, 61 L.Ed.2d 309 (1979). *Chapman v. Pickett,* 491 F.Supp. 967 (C.D.Ill.1980). This circuit reversed, ruling that *Rummel* did not apply to this case. *Chapman v. Pickett,* 645 F.2d 73 (7th Cir.1980) (unpublished order). The court found that the district judge had departed from the law of the case and again remanded for a determination of when plaintiff's eighth amendment violation began and a calculation of what damages were appropriate. *Chapman v. Pickett,* 676 F.2d 697 (7th Cir.1982) (unpublished order).

Defendants assert that Chapman's remarks concerning the supervisor at Leavenworth properly may have been considered in determining the length of Chapman's confinement, even though defendants admit the Leavenworth investigation of the oven incident did not raise Chapman as a suspect. If the prison authorities had wished to charge Chapman with threatening another with bodily harm, they could have done so; it was, in fact, a separately listed "Prohibited Act" under Prison Code § 004. No such charge was ever made, nor was any hearing regarding it ever held. Defendant Pickett did not even reply to Chapman's request for a formal explanation of his confinement. The mere fact that the remark was listed in the violation report and the investigator's report is not sufficient. Not having been communicated to Chapman as a ground for the decision, it may not properly be relied on as justifying the punishment of indeterminate segregation.

*Chapman v. Pickett*, 586 F.2d 22, 28 n. 4 (7th Cir.1978). Never in the nine months of his segregation did any of the defendants profess that the remark was the reason for Chapman's being penalized. Moreover, the officials knew that Chapman was not suspected of causing any harm to the employee at Leavenworth. We can only conclude that Chapman was punished solely for the offense he was charged with—failing to perform work as instructed by his supervisor. As the Adjustment Committee explained in its Committee Action Report of October 11, 1972:

> The inmate stated that he has a Muslim order and that he always follows them to the letter. It forbids one from being around pork much less touch or eat. It is Allah's way. Now that he is in our house he will do as he is told.

Appendix for Plaintiff-Appellee, Cross-Appellant at A–28. As a result of this determination, Chapman was kept in virtual isolation for nine months with severe restrictions on his mobility and daily routine. We cannot say that Chapman did not suffer actual damage.

## II.

Granting that Chapman has suffered actual damage, it is appropriate to consider his argument that he should have received more than $7,000 in compensation for his injuries. He notes that in certain instances courts have overturned damage awards that were substantially out of line with awards in similar cases. *See Levka v. City of Chicago*, 748 F.2d 421 (7th Cir. 1984) ($50,000 award for victim of unwarranted strip search reduced as excessive); *Phillips v. Hunter Trail Community Association*, 685 F.2d 184 (7th Cir.1982) ($25,000 award for victim of Fair Housing Act violation reduced as excessive). Plaintiff points out that he received approximately $25 per day for his injuries while other victims of wrongful segregation have sometimes received more. *See Mary & Crystal v. Ramsden*, 635 F.2d 590 (7th Cir.1980) ($80 per day damages to juveniles who were wrongfully confined); *United States ex rel. Larkins v. Oswald*, 510 F.2d 583, 584 (2d Cir.1975) ($80 per day damages to segregated prisoner who was subjected to strip search and probing of his anal cavity); *Maxwell v. Mason*, 668 F.2d 361 (8th Cir.1981) ($100 per day for wrongful detention in solitary confinement).

The district judge sitting as factfinder has broad discretion in assessing damages. *See Saxner v. Benson*, 727 F.2d 669, 672–73 (7th Cir.1984) ("In view of the general restrictions on appellate review of a jury's award of monetary damages we will not substitute our judgment in these circumstances for that of the judge and jury who heard the testimony."), *aff'd sub nom. Cleavinger v. Saxner*, —— U.S. ——, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985); *Phillips v. Hunter Trail Community Association*, 685 F.2d at 191. His findings will not be overturned unless found to be clearly erroneous. Plaintiff contends that the decision here was clearly erroneous because some prisoners received damages more than four times per day greater than what he received.

An individual can always point to cases in which others received more and say that he received too little. To accept that argument is to say that a court must match the most generous offer made elsewhere, even though the circumstances of the case before it may be different and even though it may be the higher awards that less accurately reflect actual damages. In cases of wrongful segregation, at least one other court has awarded sums to victims of wrongful segregation similar to what Chapman received. *See Riley v. Johnson,* 528 F.Supp. 333, 343 (E.D.Mich.1981) ($25 per day). While some courts have awarded larger amounts, this may have been due to factors not present in Chapman's case. For example, the plaintiffs in *Mary & Crystal v. Ramsden* were juveniles. The plaintiff in *United States ex rel. Larkins v. Oswald* was marched naked to his cell and subjected to a strip search and the probing of his anal cavity. The district judge was aware of these cases when he calculated his award. We cannot say he abused his discretion.

### III.

■ Chapman also seeks punitive damages. A court may award punitive damages "when the defendant's conduct is shown to be motivated by evil motive and intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). Here, the district court found that even though defendants' good faith belief that plaintiff had threatened an officer was not a basis for segregating Chapman, it did provide grounds for denying punitive damages. The award of punitive damages is also within the sound discretion of the district judge and his finding will not be disturbed.

### IV.

■ The final issue raised on appeal is whether defendants may be held personally liable for plaintiffs damage.[4] A plaintiff may establish personal responsibility "if the official acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent." *Crowder v. Lash,* 687 F.2d 996, 1005 (7th Cir.1982); *Wellman v. Faulkner,* 715 F.2d 269, 275 (7th Cir.1983). This test was clearly satisfied as to the three members of the Adjustment Committee and Associate Warden Frey. The members of the Adjustment Committee made the initial determination that plaintiff should be confined to segregation. They met repeatedly during his time in segregation to review his case. While in a position to return plaintiff

---

**4.** Defendants claim they should be immune from liability. They initially argued that they were absolutely immune from liability but this argument was foreclosed by the Supreme Court's decision in *Cleavinger v. Saxner,* ——— U.S. ———, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), that members of prison disciplinary committees receive only qualified and not absolute immunity. The defendants now claim they should receive qualified immunity from liability for violations of plaintiff's eighth amendment rights. They did not advance a qualified immunity argument before the district court in this case. In 1978, this circuit rejected defendants' qualified immunity argument and concluded:

There can be no serious contention with the fact that the right to be free from disproportionate punishment has long been 'clearly established.' At least as early as 1910, the Supreme Court declared it to be 'a precept of justice' that punishment for crime must be proportioned to the offenses, lest it be found

to be cruel and unusual. *Weems v. United States,* 217 U.S. 349, 367 [30 S.Ct. 544, 549, 54 L.Ed. 793].

*American Intern. Ins. Co. v. Vessel SS Fortaleza,* 585 F.2d 22, 28 (7th Cir.1978). Since that time the Supreme Court has decided *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). That case articulated an objective standard for determining qualified immunity. Under that test "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. We do not believe that *Harlow* changes the 1978 result. In 1972 it was established that excessive punishment in segregated confinement for the exercise of a religious right could subject prison officials to liability. *See Bryant v. Harris,* 465 F.2d 365, 367 (7th Cir.1972).

to the general prison population, they kept him in segregation for nine months. Associate Warden Frey participated in many of the meetings concerning Chapman's confinement. In his position as supervisor, he too had the power to correct plaintiff's wrongful confinement. Under similar circumstances in *Crowder* we found the personal responsibility requirement had been met:

> The evidence presented by Crowder indicated that both Moore and Devero sat as members of the disciplinary committee and, thus, participated directly in the "disciplinary hearings" by which Crowder was repeatedly sentenced to confinement in the D.O. seclusion unit. In addition, Crowder testified that Moore and Devero were directly responsible for denying his requests for legal assistance and legal materials.... Moreover, because Moore and Devero were personally accountable for reviewing the status of inmates held in D.O. seclusion, they could properly be held liable for an eighth amendment violation if, at any time, Crowder's continued confinement in D.O. seclusion became unlawfully disproportionate to the seriousness of his prison infractions.

687 F.2d at 1006.

Warden Pickett's personal liability presents a more difficult question. Courts have exacting standards for establishing supervisory officials' personal liability and hesitate to saddle supervisors with responsibility for decisions they did not make. The dissent points to cases that have not met these exacting standards and apparently concludes that "supervisory officials are not liable for failing to intervene to ameliorate things." However, the law does not accord supervisors such sweeping freedom from liability. Rather, established law holds that under certain circumstances supervisors may be personally liable for failing to act when they have knowledge of a constitutional deprivation. *See Crowder v. Lash*, 687 F.2d at 1005; *Cf. McKinnon v. City of Berwyn*, 750 F.2d 1383, 1391 (7th Cir.1984) (failing to supervise subordinates may be actionable). The knowledge that is required is not only that a constitutional deprivation exists but also that the supervisor's personal action is necessary to set it right.

The requisite knowledge is present in this case. Warden Pickett stipulated to knowing of Chapman's confinement and doing nothing about it, even after he received a letter from the Director of Prisons—Pickett's own supervisor. He stipulated before the district court

> that among his duties was to see that discipline was maintained at the prison; that as chief officer of the prison Mr. Picket[t] had the authority to override the decisions of officers at the prison; that Mr. Picket[t] was aware of Plaintiff's placement in segregation on October 11, 1972 and that he was continued and confined there until July 25, 1973; that on March 15, 1973 Mr. Picket[t] received a copy of a letter from Norman A. Carlson, Director, Federal Bureau of Prisons to Representative Charles Rangel. The letter indicated, ... "We have your letter of January 11, 1973 concerning Mr. Edward Chapman. In your letter we take exception to your statement of January 17, 1973, that men of the Black Muslim Faith at our facility were assigned the task of handling pork. We reviewed the situation and have communicated to the heads of the department of instructions not to assign individuals to details where they must work with pork as it is against their religious beliefs."

Transcripts of Proceeding Before District Court, Nov. 3, 1976 at 95.

Pickett was the official at Marion to receive Director Carlson's communication, which should have put him on notice that Chapman was wrongfully segregated. While that placed him in the best position to know that a constitutional deprivation had occurred and while he had the authority to remedy the situation, he did nothing. Chapman remained in segregated confinement for more than four more months. Under these circumstances, the district court was entitled to find Warden Pickett

personally liable and we cannot say this disposition was clearly erroneous.[5]

For the foregoing reasons the judgment of the court below is AFFIRMED.

EASTERBROOK, Circuit Judge, dissenting.

This first amendment case has turned into an eighth amendment one because of the court's holding in 1978 that the defendants have qualified immunity from damages for punishing Chapman on account of his religious beliefs. 586 F.2d 22, 25–26. The extent to which public officials may or must accommodate sincere religious beliefs has produced a series of cases that are hard to reconcile and apply. These cases divide the Justices deeply. E.g., *Bowen v. Roy*, —— U.S. ——, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986); *Goldman v. Weinberger*, —— U.S. ——, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986). See also *Caldwell v. Miller*, 790 F.2d 589, 597–600 (7th Cir. 1986); Michael W. McConnell, *Accommodation of Religion*, 1985 Sup.Ct.Rev. 1. A humane prison administration accommodates religious beliefs when assigning jobs, as the Bureau of Prisons now does, but it was not clear in 1972 that it had to. I do not think it is clear today, given cases such as *Goldman* and the fact that a prisoner is more like a member of the military than of free society. See also *Madyun v. Franzen*, 704 F.2d 954, 958–60 (7th Cir.1983). This establishes the immunity of the defendants from damages under the first amendment.

This left for decision in 1978 the claim that nine months in segregation is "exces-sive" for the offense of refusing to handle pork in the kitchen. The panel both found a violation of the eighth amendment and rejected the defendants' claim of immunity, stating: "At least as early as 1910, the Supreme Court declared it to be 'a precept of justice' that punishment for crime must be proportioned to the offense, lest it be found to be cruel and unusual. *Weems v. United States*, 217 U.S. 349, 367, 30 S.Ct. 544, 549, 54 L.Ed. 793 (1910). This being so, the question becomes whether defendants 'knew or should have known' that their confinement of Chapman to segregation was or became grossly disproportionate to the offense with which he had been charged. But this question almost answers itself, for if a point in time can be determined when the punishment became so seriously disproportionate as to violate the Eighth Amendment, at that same point defendants 'should have known' that the punishment was grossly excessive. Thus, ... the defense of qualified official immunity is not available for damages arising out of Chapman's Eighth Amendment claim." 586 F.2d at 28–29.

Several components of this decision are untenable. One is that "excessively long" separation from the general population of a prison violates the eighth amendment. A second is that the general enunciation of a right—such as "let the punishment fit the crime"—is the sort of clear articulation that dissipates immunity. A third is that by 1973 this general right had been applied to prison discipline. A fourth is that official immunity does not apply to violations of the eighth amendment.

---

**5.** The dissent is in all other particulars an attack on *Chapman v. Pickett*, 586 F.2d 22 (7th Cir. 1978). None of the points raised by the dissent (apart from the immunity arguments) has been argued by the government here for the very good reason that, except under rare circumstances, one panel of this court may not overrule a result reached by another panel. *See Devines v. Maier*, 728 F.2d 876, 880 (7th Cir.), *cert. denied*, 469 U.S. 836, 105 S.Ct. 130, 83 L.Ed.2d 71 (1984); *Appleton Electric Co. v. Graves Truck Line, Inc.*, 635 F.2d 603, 607 (7th Cir.1980) ("we have long held that 'matters decided on appeal become the law of the case to be followed ... on second appeal, in the appel-late court, unless there is plain error of law in the original decision.'") (quoting *Kaku Nagano v. Brownell*, 212 F.2d 262, 263 (7th Cir.1954)). The law of the case doctrine has an extremely persuasive rationale in this case as in others, and one can hardly imagine a matter more fraught with Pandora's Box potential than reopening the judgments reached by prior panels in the same case. The "change of law" rationale offered by the dissent for its extraordinary exploration of closed matters seems to us, under the circumstances of this case, a license to second-guess, or apply hindsight, to any number of otherwise settled decisions of this court.

The majority does not discuss these holdings, on which its judgment depends, even though the defendants maintain that the immunity holding in 1978 is incorrect and should be reviewed in light of more recent cases. My brethren rely on the law of the case.[1] It is unwise for one panel to undo the work of another in the same case. Litigants should be able to assume that panels of this court are alike. Otherwise they will spend their time (and ours) trying to convince each panel to follow or upset the last decision. The law of the case is a salutary doctrine even when a judge believes that an earlier decision is wrong. Yet the doctrine has exceptions, the most important being for intervening changes in the law. See *Arizona v. California*, 460 U.S. 605, 618–19 & n. 8, 103 S.Ct. 1382, 1391 & n. 8, 75 L.Ed.2d 318 (1983); *Cameo Convalescent Center, Inc. v. Percy*, 800 F.2d 108, 109–10 (7th Cir.1986); *Chicago & North Western Transportation Co. v. United States*, 574 F.2d 926, 930 (7th Cir.1978). See also, e.g., *Devines v. Maier*, 728 F.2d 876, 880 (7th Cir. 1984) (discussing an exception for clear error in the earlier decision, error that usually becomes "clear" because of intervening decisions); *Christianson v. Colt Industries Operating Corp.*, 798 F.2d 1051, 1056 (7th Cir.1986) (a decision that is "manifestly incorrect" may be reexamined even when there has not been an intervening change of law). Although the majority's opinion applies the principles that have been established in the earlier opinions in this case, it is appropriate to reexamine these principles in light of decisions after 1978 and a few earlier decisions that the panel overlooked in 1978. The portion of that decision based on the eighth amendment is wrong in just about every particular. It ought not stand. Moreover, the majority introduces a new error, which I discuss at the end of this opinion.

1. *Weems*, which the panel cited in 1978 for the proposition that "excessive" punishments are forbidden, was a case about prison conditions, life at hard labor in chains, rather than about the duration of confinement alone. The other applications of the eighth amendment to prisoners also are about conditions—about the amount of space a prisoner has, about the quality of the food, about medical care, about freedom from injury. E.g., *Whitley v. Albers*, —— U.S. ——, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Caldwell*, 790 F.2d at 600–01; *Duckworth v. Franzen*, 780 F.2d 645 (7th Cir.1986); *French v. Owens*, 777 F.2d 1250 (7th Cir. 1985). If Chapman had been sent to a hellhole, he would have a claim under the eighth amendment. But segregation at Marion is not infernal. Many prisoners stay a lot longer than nine months in Marion's Control Unit, which is worse. Chapman does not contend that the conditions of segregation independently violated the Constitution.

If the conditions of segregation at Marion are within the tolerable range, and if damages are not the appropriate response to the *reason* Chapman was put in segregation—as we must assume given the holding that Chapman is not entitled to relief under the first amendment—then the duration of the segregation was not unconstitutional. Chapman did not tell the prison officials that he would start clearing the dishes. He held to his beliefs. Every day Chapman was in segregation was a day on which he would have refused to handle pork. So if the eighth amendment establishes a principle of proportional length of differential treatment within a prison, the defendants did not transgress against it. This was no more a violation of the eighth amendment than nine months' confinement

---

1. Chapman also contends that the defendants have not preserved these issues, because they did not raise them in the district court after the decision of 1978. They have done what they must, however. A litigant need not pester the district court with requests to violate the court of appeals' mandate in order to preserve the right to ask the appellate court to reexamine its earlier holdings.

of a recalcitrant witness before a grand jury would be.

The most substantial problem with our 1978 decision, however, is its assumption that a prisoner has *any* legally protected interest in enjoying the same conditions of confinement as other prisoners. Chapman did not serve an extra day because of his refusal to handle pork. He simply had less pleasant conditions. Suppose he had been transferred from a minimum security prison to Marion because of his refusal to do assigned work. His loss would have been greater than the difference between the general population and segregation at Marion. It is established, however, that a conviction for crime allows executive officials to place prisoners where they will, to subject them to the range of conditions in the Nation's many prisons. *Meachum v. Fano*, 427 U.S. 215, 224–25, 96 S.Ct. 2532, 2538–39, 49 L.Ed.2d 451 (1976); *Moody v. Daggett*, 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 279 n. 9, 50 L.Ed.2d 236 (1976); *Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983).

The question about "disproportionate sentences" under the eighth amendment is whether a state has deprived a person of his liberty for too long, given the nature of the offense. There is a big difference between being in and being out of prison. Chapman's natural liberty, though, was not hanging in the balance. His liberty to select where and how he would live had been extinguished by the judgment of conviction. See *Hudson v. Palmer*, 468 U.S. 517, 524–28, 104 S.Ct. 3194, 3199–3201, 82 L.Ed. 2d 393 (1984). That is why the Court held in *Meachum* that a conviction authorizes the state to confine a prisoner in any of its institutions, even though one may be much less pleasant than another. For the same reason a state may confine its prisoners in any cell within a prison or change the prisoner's regimen—individual meals in segregation instead of group meals in the general population, fewer showers, less exercise, and so on. *Hewitt v. Helms*, 459 U.S. 460, 468, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983) (segregation within a prison "is the sort of confinement that inmates should reasonably anticipate receiving at

some point in their incarceration"). There is no constitutional difference between segregation and the general population; prisoners have no entitlement that prisons have "general populations", as our recent decision sustaining the "lockdown" of the entire population at Marion for more than nine months shows. *Caldwell*, 790 F.2d at 600–05.

The panel did not discuss these principles in 1978. It did not cite *Meachum* and similar cases. *Hewitt*, which held that a prisoner does not have a constitutional interest in remaining in the general population, was not decided until 1983. True, *Meachum* and *Hewitt* interpreted the fourteenth rather than the eighth amendment. Yet these cases are not accidents of pleading. The Court would not have rendered a different decision if the prisoners had argued their cases under the eighth amendment instead of the due process clause of the fourteenth. After all, the eighth amendment applies to the states only to the extent it has been "incorporated" in the due process clause of the fourteenth. *Meachum, Hewitt, Hudson* (holding that prisoners have no legitimate expectation of privacy), and similar cases establish that the Constitution does not entitle prisoners to live in the best conditions a prison has to offer.

The state may *create* protected interests. It may, for example, adopt rules providing that people will be sent to Marion (or closer confinement within Marion) only on account of misconduct. Rules restricting the discretion of officials may establish legitimate claims of entitlement of which prisoners may be deprived only with due process of law. The Court ultimately held in *Hewitt* that Pennsylvania's regulations created a legitimate claim of entitlement to remain in the general population even though the Constitution of its own force does not. See also *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and the treatment of *Wolff* in *Meachum*, 427 U.S. at 225–27, 96 S.Ct. at 2538–40. The question from this perspective is whether rules restricted the discretion of the defendants to put Chapman in segrega-

tion for refusing to work. In 1980 we remarked on the difference between process and substance in prison discipline, implicitly repudiating the premises of our 1978 decision. *Bono v. Saxbe,* 620 F.2d 609, 611–12 (7th Cir.1980), holds that the due process clause rather than the eighth amendment governs the duration of segregated confinement at Marion, unless the conditions of confinement are unconstitutionally harsh.[2] Ours is not a due process case. Chapman had a hearing. He does not contend that the hearing was procedurally defective or that the defendants lacked authority under the regulations then in force to put him in segregation. He therefore cannot recover under the due process clause, and he does not seek to do so.

There is one more way in which this case may be argued under the eighth amendment. If the prison officials *knew* that they had no basis to punish Chapman, but they put him or kept him in segregation vindictively, this might state a claim. Prison officials must have some reason to impose punishment, if they set up rules confining their discretion. *Superintendent of Walpole v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). The prison officials had reason to punish Chapman. He defied a direct order and said he would defy it again. He gave a reason for disobedience, but under our 1978 decision the defendants have immunity from damages on account of their refusal to accept his reason. It is as if Chapman had been put in segregation for refusing to press green shirts in the laundry, proclaiming that green shirts look better crinkled. Involuntary servitude is the portion of convicts, the thirteenth amendment says. A prisoner who decides he will work only on terms satisfactory to himself must expect his confinement to become even more onerous than it was. Chapman's disobedience is

justification for discipline under Marion's rules. More, the district court found that the prison officials did not act maliciously or vindictively; this is the basis on which the court denied punitive damages. This potential source of liability is foreclosed.

Marion is an explosive place. It is the Nation's maximum security prison, populated by violent and intractable offenders who could not adjust to life in other prisons. Administrators of prisons have hard tasks. They cannot control the population without authority over it, yet every exercise of authority may expose them to liability. The Supreme Court has said over and again that courts should respect prison officials' exercise of judgment. We have said over and again that the officials at Marion, whose task is especially difficult, deserve especial deference. E.g., *McCollum v. Williford,* 793 F.2d 903 (7th Cir.1986) (Marion may discipline prisoners on the basis of reports withheld even from the disciplinary committee, although that might be impermissible at other prisons). Officials may respond to judicial orders reducing their discretion by exerting control in other ways. They can change the way the prison is organized. There will be no more disobedience at Marion during work details. Work has been cancelled. Guards or contractors clean the dishes and press the shirts. The prisoners stay locked in their cells. I doubt that they count the trade a gain.

It is hard to imagine a rule more enervating than one that allows a prisoner to collect damages from his keepers on the ground that they should have returned him to the general population, after an admitted offense, in six months rather than nine, or perhaps in three weeks rather than four. This transfers effective authority from the warden to a jury; it increases the risk of taking firm measures. The prison's offi-

---

**2.** *Bono* replaces the eighth amendment analysis with one styled "substantive due process", see 620 F.2d at 615–18, and this replacement is as inconsistent with *Meachum, Moody, Hewitt,* and *Olim* as is our 1978 case. *Hewitt* knocked the struts out from under *Bono* by holding that the Constitution does not independently regulate transfers to segregation; an analysis based on

"substantive due process" assumes the contrary. See also *Gumz v. Morrissette,* 772 F.2d 1395, 1405–09 (7th Cir.1985) (concurring opinion), *cert. denied,* — U.S. —, 106 S.Ct. 1644, 90 L.Ed.2d 189 (1986). But this is not the time to deal with substantive due process, which Chapman has not invoked. See also note 3 below.

cials will not know what they may do until the case is over and the decision has been rendered on appeal. Yet if administrators react to this threat to their wallets by going easy on misconduct, the result may be the deaths of prisoners and guards alike. There have been too many deaths at Marion to be sanguine about lax discipline. The Framers did not decide in 1789 (when Congress sent the Bill of Rights to the States) or 1791 (when Virginia provided the ratification necessary to put the first ten amendments into effect) to commit to juries the question whether a prisoner's separation from the general population lasted too long in light of the seriousness of his offense. We have no authority to decide so today.

2. Assume now that this is wrong, that Chapman spent an unconstitutionally long time in segregation. The defendants are entitled to immunity from liability in damages unless their acts violated "clearly established ... constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). See also *Cleavinger v. Saxner,* —— U.S. ——, 106 S.Ct. 496, 504, 88 L.Ed.2d 507 (1985). The panel thought in 1978 that *Weems* had "clearly established" that "excessive" punishments are unconstitutional.

This is sleight of hand. It is always possible to state the constitutional right at a level so general that it "clearly establishes" the right in question. If a question arises, such as whether an Attorney General may authorize a national security wiretap without a warrant, a court could reply that the Supreme Court established a presumption in favor of warrants, and in 1967 the Court applied this to the interception of telephone conversations. So by the time Attorney General Mitchell came to office, it was "clearly established" that there had to be a warrant for an interception. This was not, however, the method the Supreme Court used to decide the case. It asked instead when the general rule had been made specific—that is, when the Court first held that national security wiretaps require a warrant. See *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 2818–20 & n. 12,

86 L.Ed.2d 411 (1985). Similarly, if a question arises whether an affidavit establishes probable cause to obtain a warrant, a court could say: "It has long been established that you need probable cause to get a warrant, so if you got a warrant without probable cause you are liable." But "probable cause" is too general. In *Malley v. Briggs,* —— U.S. ——, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), the Court concluded that the right question is whether a well trained and careful official should have known that his conduct would be viewed as unconstitutional in light of the available precedents. It wrote: "[d]efendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." 106 S.Ct. at 1096; see also *id.* at 1098–99.

Until the constitutional right has been stated so that reasonably competent officers would agree on its application to a given set of facts, it has not been "clearly established" for purposes of *Harlow.* In several cases since 1978 we recognized this. E.g., *Zook v. Brown,* 748 F.2d 1161, 1165 (7th Cir.1984); *Coleman v. Frantz,* 754 F.2d 719, 730 n. 15 (7th Cir.1985); *Lojuk v. Johnson,* 770 F.2d 619, 628 (7th Cir.1985); *Benson v. Allphin,* 786 F.2d 268, 275–76 (7th Cir.1986). *Azeez v. Fairman,* 795 F.2d 1296 (7th Cir.1986), is the most recent, and its discussion is dispositive (*id.* at 1301): "The words 'clearly established ... constitutional rights' may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms, so that anyone who prevails on the merits of a claim based on (for example) the First Amendment's free exercise of religion clause, however novel that claim is, can defeat the defense of immunity simply by pointing out that the right to the free exercise of one's religion has long been a clearly established constitutional right. The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful." See also *Hobson v. Wilson,* 737 F.2d 1, 26

924

(D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). Our decision of 1978 is a derelict—in this circuit anyway. I recognize that it has company in other circuits, e.g., *Creighton v. City of St. Paul,* 766 F.2d 1269 (8th Cir.1985), *cert. granted* under the name *Anderson v. Creighton,* —— U.S. ——, 106 S.Ct. 3292, 92 L.Ed.2d 708 (1986), but these decisions predate *Malley* and do not explain why it is appropriate to take a broadly phrased right as "clearly establishing" a particular application. Our court should attorn to the standard of *Azeez,* under which the law in 1972–73 had not "clearly established" that the eighth amendment forbids "excessive" terms of segregated confinement within a prison.[3]

Officers of "reasonable competence could disagree" (*Malley,* 106 S.Ct. at 1096) about the propriety of their conduct in 1973. As this opinion shows, judges still disagree about the constitutional standards. The defendants will take cold comfort in knowing that they have been found liable—on the ground that no reasonably well trained person could have believed they were entitled to act as they did—for doing something that the district court thought they were entitled to do (our decision in 1978 reversed the district court) and that at least one judge of this panel thinks the Constitution allows them to do. Cf. *Nix v. Williams,* 467 U.S. 431, 350–51, 104 S.Ct. 2501, 2512–13, 81 L.Ed.2d 377 (1983) (White, J., concurring).

3. The answer to the question "was it clearly established in 1973 that the eighth amendment forbids 'excessive' administra-

tive punishments" is No. It is not so established today. It certainly was not so established in 1973. Not until June 1983, when it decided *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637, did the Supreme Court hold a criminal sentence invalid because too long. Earlier cases had held that the length of a punishment, as opposed to its character (torture, death, and so on), is a matter for the judgment of the legislature and the sentencing court. E.g., *Hutto v. Davis,* 454 U.S. 370, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982); *Rummel v. Estelle,* 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980); *Badders v. United States,* 240 U.S. 391, 395, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916); *Howard v. Fleming,* 191 U.S. 126, 136, 24 S.Ct. 49, 50, 48 L.Ed. 121 (1903). *Hutto* and *Rummel,* decided after 1978, show that the eighth amendment does not authorize federal courts to insist that punishments be finely proportioned to the crime. The Supreme Court has not extended the principle of *Solem* to intra-prison sanctions, and *Solem* itself suggests that only outrageous punishments (life in prison for shoplifting) violate the eighth amendment. No court to this day has held that nine months in prison is cruel and unusual punishment for anything, even jaywalking.[4] Statutes often authorize misdemeanors, a rag-tag collection of small offenses, to be punished by a year's imprisonment. And because Chapman was not sent *to* prison for refusing to handle pork, but was just moved to a new cell *in* prison, the analogy to other cases under the eighth amendment is even weaker.

The only case that arguably makes the right in question sufficiently particular is

---

3. The panel intimated in 1978 that the prison officials should have released Chapman to the general population soon after the Bureau of Prisons adopted its policy against assigning people to handle foods forbidden them by their religions. This amounts to saying that the administrative rules of the prison system "established" the constitutional right. *Davis v. Scherer,* 468 U.S. 183, 194 & n. 12, 104 S.Ct. 3012, 2019 & n. 12, 82 L.Ed.2d 139 (1984), holds otherwise. *Davis* establishes that only when the rule establishes the claim for relief sued upon does a violation of a "clear" rule abrogate an immunity. See also *Gramenos v. Jewel Companies, Inc.,* 797 F.2d 432, 434 (7th Cir.1986). Chapman is not entitled to recover damages on account of a violation of the Bureau of Prisons' internal rules,

especially a rule that was adopted after he had been put in segregation and that does not mention the appropriate treatment of prisoners in Chapman's position. It is the eighth amendment or nothing.

4. I put to one side the remark in *Robinson v. California,* 370 U.S. 660, 667, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962), that one day is cruel and unusual for the crime of having a common cold. Colds imprison the best of us, and at all events the case dealt with the minimum requirements for criminal punishment, not with the duration of imprisonment in relation to the gravity of the offense.

*Adams v. Carlson,* 488 F.2d 619, 635–36 (7th Cir. Aug. 23, 1973), which the panel in 1978 said (586 F.2d at 27) establishes that any "disproportionate" punishment in prison is unconstitutional. *Adams,* based on principles of procedural due process, preceded *Meachum, Moody,* and *Hewitt.* It is no longer authoritative. *Adams* did not hold that the eighth amendment directly limits the duration of segregation from the general population. Its discussion of the eighth amendment melds principles of due process with those of proportionality, and it ultimately holds that the claims before it under the eighth amendment were not ripe for adjudication. A decision concluding that it could not resolve the dispute at hand—that Article III forbade a disposition on the merits of the eighth amendment claim—cannot "clearly establish" any legal principles, not unless advisory opinions have become the law of the land.

More to the point, *Adams* was decided after Chapman had been released from segregation! The case arose out of a prison disturbance at Marion, whose officials summarily confined a number of prisoners in indefinite segregation. The prisoners sought an injunction to compel their release. The district court held that this confinement did not violate the constitutional rights of the prisoners. *Adams v. Carlson,* 352 F.Supp. 882, 891–94 (E.D.Ill. Jan. 15, 1973). At the time the defendants decided to keep Chapman in segregation, then, they had recently been told by a district court that prisoners at Marion had no constitutional rights that impeded lengthy segregation. It is beyond me how the defendants were supposed to know the opposite—let alone how the opposite could be said to have been "clearly established" in the spring of 1973. See also *Benson,* 786 F.2d at 278.

4. Our decision of 1978 suggested that there can be no immunity when the right in question is the eighth amendment. The Ninth Circuit apparently takes this view. Compare *Haygood v. Younger,* 718 F.2d 1472, 1483–84 (1983), modified en banc, 769 F.2d 1350, 1358–59 (1985), with *Albers v. Whitley,* 743 F.2d 1372, 1376 (1984), rev'd

on other grounds, ―― U.S. ――, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Another panel of this court has applied the *Harlow* standard of immunity to a violation of the eighth amendment, however, see *Joseph v. Brierton,* 739 F.2d 1244, 1249–50 (7th Cir. 1984), although it rejected the defense on the facts presented, and at least two other circuits hold that officials who violate the eighth amendment may be immune from liability in damages. *Sampson v. King,* 693 F.2d 566 (5th Cir.1982); *McCray v. Burrell,* 516 F.2d 357, 370–72 (4th Cir.1975) (en banc).

The *Harlow* standard logically applies to cases under the eighth amendment. The definition of the violation sometimes includes a mental element (such as "deliberate indifference", see *Whitley* and *Duckworth* ), but the test under *Harlow* is objective, so that the mental element does not dispose of the immunity question. It is quite consistent to say that the defendants *wanted* Chapman to suffer, or were indifferent to whether he did, and that a reasonable person would have believed in 1973 that the infliction of punishment was lawful. The police officer who shoots a fleeing subject wants to injure that person, but it does not follow that the officer never can claim immunity for wrongful use of force. If a reasonably well trained officer (*Malley,* 106 S.Ct. at 1098) would have concluded that it was permissible to use force, the defendant's subjective intent to inflict pain does not abrogate the immunity. So here. If a reasonably well trained warden or disciplinary committee would have thought in 1973 that it was permissible to keep someone in segregation for nine months for a nonviolent (but deliberate) infraction of the prison's rules, an infraction the prisoner had pledged to repeat, then there should be qualified immunity. Only when the presence of the mental element that defines the violation also shows that no reasonably well trained official could have thought his behavior proper, as in *Joseph v. Brierton,* is the existence of a violation incompatible with immunity.

5. The discussion so far explores my disagreements with the decision in 1978. I have one disagreement with the decision of

today. The district court held former Warden Pickett liable along with his subordinates. No evidence in the record shows that Pickett authorized Chapman's segregation or approved its duration. The stipulation to which the majority refers shows only that the Warden knew that Chapman was in confinement and did nothing, even after receiving a letter stating that the Bureau of Prisons had adopted a policy relieving people of handling food to which they objected on religious grounds. The record does not show that the Warden read this letter (the stipulation says that he "received" it) or that wardens in federal prisons customarily review disciplinary cases in light of changing directives. For all the record shows, wardens leave these things, along with most of the other tasks of management, to their subordinates. Wardens establish policy and assign tasks; detail work and daily administration are among the tasks parcelled out.

The eighth amendment does not establish superiors' liability. A warden is liable only for what he does, not for what he fails to prevent his subordinates from doing. The division of labor and the delegation of functions within a prison are not unconstitutional. A warden asleep on the job will have to answer to his superiors, but dozing off on company time is not a violation of the Constitution. The proper defendants are those who put Chapman in segregation and, despite regularly reviewing his status, refused to let him out. We have held that supervisory officials are not liable for failing to intervene to ameliorate things. E.g., *Kunzelman v. Thompson*, 799 F.2d 1172–75 (7th Cir.1986); *Walker v. Rowe*, 791 F.2d 507, 508–09 (7th Cir.1986); *Ustrak v. Fairman*, 781 F.2d 573, 575–77 (7th Cir. 1986); *Duckworth v. Franzen*, 780 F.2d at 650; *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1390 (7th Cir.1984); *Wellman v. Faulkner*, 715 F.2d 269, 275–76 (7th Cir. 1983), *cert. denied*, 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984); *Crowder v. Lash*, 687 F.2d 996, 1005–06 (7th Cir.1982); *Duncan v. Duckworth*, 644 F.2d 653, 655 (7th Cir.1981); *Adams v. Pate*, 445 F.2d 105, 107 (7th Cir.1971). Some of these cases are very similar to this. In *Adams v. Pate*, for example, the court held that notice to a warden that a prisoner was being beaten did not justify damages when the warden did not take steps to prevent future beatings.

A prison may apportion responsibilities among officials without exposing supervisors to liability on the ground that they failed to prevent what the subordinates were doing. The majority does not reconcile its holding with the cases I have cited. The "clearly erroneous" doctrine, to which the majority refers, applies to facts and inferences; I do not think, however, that facts and inferences are disputed. The question is whether on stipulated facts the warden of a prison is liable for failing to prevent a violation of the eighth amendment by his subordinates. The stipulation of facts does not suggest, and the district court did not find, that Warden Pickett had either the personal role or the mental state required for a violation of the eighth amendment.